WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Eric Joseph Jaramillo,<br><br>Defendant. | No. CR-22-02284-001-TUC-RM (MSA)<br><br>**REPORT AND RECOMMENDATION** |

Defendant Eric Jaramillo, who is charged with transportation of illegal aliens for profit, moves to suppress the evidence against him on the ground that it was obtained in violation of the Fourth Amendment. The Court will recommend that the motion be denied.

## Background[1]

The disputed vehicle stop occurred in southern Arizona on July 26, 2022, around 12:30 p.m. (Tr. 50–51.) Border Patrol Agent William Stanley was in his unmarked patrol vehicle at the intersection of Kings Ranch Road and Jaykay Drive—less than three miles north of the international border—when he saw a black sedan pass through the intersection traveling south on Kings Ranch. (Tr. 7–9, 11; Pl.'s Ex. 7.) Agent Stanley has been an agent for 16 years, and his responsibilities include placing cameras in spots where agents have seen an increase in noncitizen foot traffic. (Tr. 4–7.) On that day, he was aware of a recent increase in such traffic just south of his position. (Tr. 8, 23–24.)

About ten minutes later, Agent Stanley saw the car pass through the intersection

---

[1] "Tr." refers to the transcript of the evidentiary hearing held on June 12, 2023.

again, this time heading north. (Tr. 11–12, 27.) He noticed that the sides of the car were clean. (Tr. 12, 20.) This led him to suspect that the car did not belong to a local resident; according to Agent Stanley, locals usually had "filthy" vehicles because it was monsoon season and all the roads south of Kings Ranch were muddy dirt roads. (Tr. 11–12.) Agent Stanley also noticed that the car was speeding. (Tr. 12.) He knows from experience that smugglers want to avoid being seen in the pickup location, so they speed to get out of the area quickly. (Tr. 24–25.)

Agent Stanley began following. (Tr. 12.) A few moments later, he saw the car roll through a stop sign and turn right (eastbound) onto State Route 92. (Tr. 12–13.) He caught up and ran a check of the car's license plate number, which revealed that the car had been rented from the Phoenix area. (Tr. 13, 44–45.) Agent Stanley knows from experience that smugglers use rental vehicles so that their personal vehicles will not be seized if they are caught. (Tr. 45.) In addition, in the past, he has seen individuals drive from the Phoenix area to engage in smuggling at the border. (Tr. 45.)

Agent Stanley followed the car into the nearby town of Palominas and saw it turn right into a medical clinic parking lot. (Tr. 13; Pl.'s Ex. 10.) Agent Stanley turned into a different parking lot further to the west (at the Morning Star Café) and lost sight of the car. (Tr. 13, 21, 34–35; Pl.'s Ex. 10.) Within a minute, he saw the car exit the clinic parking lot and turn left (westbound) onto State Route 92. (Tr. 13.) He found it suspicious that the car had reversed its direction, and he believed that too little time had passed for the car to drop someone off or pick someone up at the clinic. (Tr. 13–14, 47.) He began following again. (Tr. 14.)

At this point, Agent Stanley relayed over the radio that he had observed the car drive south on Kings Ranch Road and speed north a short while later, and that the car had then traveled eastbound, circled around the medical clinic, and started heading westbound. (Tr. 14.) He asked if there were any agents west of his position who could execute a stop. (Tr. 14.) Border Patrol Agent Joel Raygoza, who was in a marked patrol vehicle, responded that he was at the intersection of State Route 92 and Coronado Memorial Road (a few miles

west) and would assist. (Tr. 15, 51.)

Agent Raygoza followed the car as it turned south onto Stone Ridge Road and then onto Thompson Peak Road, both of which are dirt roads. (Tr. 16, 51.) Thompson Peak Road runs southwest about three miles from the international border. (Tr. 17, 57; Pl.'s Ex. 8.) It snakes up a "steep" and "very rocky" hill, making it unsuitable for cars, and dead-ends at two houses at the base of a mountain. (Tr. 16–17, 52, 56; Pl.'s Ex. 9.) Agent Raygoza, who is a supervisor with 20 years of experience, knows that this road is a common vehicle bailout point, as its rough terrain gives noncitizens a better chance to escape their pursuers. (Tr. 49–50, 52, 56.) In addition, Agent Raygoza could not recall the car being associated with either house at the end of the road. (Tr. 64.)

Agent Raygoza followed the car on Thompson Peak Road for a quarter mile before activating his lights and siren. (Tr. 51.) The stop revealed that Defendant was the driver and that the passengers were undocumented, so Defendant was arrested and charged with alien smuggling. (Tr. 19, 38; Doc. 1.)

## Discussion

Defendant contends that the agents lacked reasonable suspicion of alien smuggling, making the vehicle stop an illegal seizure under the Fourth Amendment. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (holding that roving border patrol stops must be supported by reasonable suspicion). The Court disagrees.

An officer has reasonable suspicion when, under the "totality of the circumstances," he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18 (1981). To clear this low bar, the officer needs more than a "hunch" but "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The reasonable-suspicion standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*,

449 U.S. at 418).

In this case, the totality of the circumstances provided the agents with reasonable suspicion of alien smuggling. From the moment he was spotted to the moment of his arrest, Defendant was never more than three and a half miles from the border, as the crow flies. (Pl.'s Exs. 7, 8.) The border uniquely implicates immigration and smuggling offenses, so Defendant's close proximity to it generated suspicion. *Brignoni-Ponce*, 422 U.S. at 878–79, 884; *see United States v. Diaz-Juarez*, 299 F.3d 1138, 1140, 1142 (9th Cir. 2002) (finding the defendant's proximity to the border (about five miles) generated suspicion).

Furthermore, in Agent Stanley's experience, it was unusual to see a Phoenix-registered vehicle on Kings Ranch Road, and the car was oddly clean considering that all the roads south of Kings Ranch were muddy dirt roads. (Tr. 11–12, 47.) In addition, he knew (because he is required to stay up to date on smuggling trends) that smugglers often use rental vehicles and that the area south of Kings Ranch had had a recent increase in noncitizen foot traffic. (Tr. 6–8, 23–24, 44–45.) This context gave the agents reason to think that the car was out of place and potentially engaged in wrongdoing. *See Brignoni-Ponce*, 422 U.S. at 884–85 (identifying "the usual patterns of traffic on the particular road," "previous experience with alien traffic," and "[a]spects of the vehicle" as relevant factors).

That suspicion was strengthened considerably when, less than ten minutes later, the car sped north and rolled through a stop sign. (Tr. 11–13.) Agent Stanley knew that smugglers tend to speed after a pickup because they do not want to be seen in the pickup area. (Tr. 24–25.) Thus, the car fit a specific and established pattern for smugglers: it was a rental vehicle, and, within a short timeframe, it drove into and sped out of a known pickup area very near the border. These circumstances generated a substantial amount of suspicion. *See Brignoni-Ponce*, 422 U.S. at 885 (identifying "[t]he driver's behavior" as a relevant factor); *Arvizu*, 534 U.S. at 277 (finding the agent reasonably inferred, based on his "observations" and "experience," that the defendant was engaged in smuggling).

Agent Stanley also saw the car travel eastbound a short distance, circle around a medical clinic parking lot, and then travel westbound. (Tr. 13.) He believed that the car

- 4 -

was not in the parking lot long enough to pick someone up or drop someone off, and, in the past, he has seen smugglers flip their direction of travel. (Tr. 13–14, 47.) In context, he reasonably found the car's maneuver unusual. This generated further suspicion. *See Brignoni-Ponce*, 422 U.S. at 885 (identifying "erratic driving" as a relevant factor).

Next, Agent Raygoza, who was following in his marked patrol vehicle, observed the car turn onto Stone Ridge Road and then onto Thompson Peak Road. (Tr. 51.)[2] This raised suspicion, for at least three reasons. First, the car was not suited for travel on Thompson Peak Road, which is "steep" and "very rocky." (Tr. 17, 52.) Second, the road dead-ends at two houses, and Agent Raygoza could not recall the car being associated with either house. (Tr. 64.) Third, and most importantly, Agent Raygoza knew that Thompson Peak Road's rough terrain made it a common vehicle bailout point. (Tr. 52.)

The foregoing factors added up to reasonable suspicion. The agents reasonably perceived the car as being out of place. The car fit a specific and established pattern for alien smugglers, and it headed toward a known vehicle bailout point after a marked border patrol vehicle began following. These circumstances were sufficient to give a reasonable person with Agent Stanley's and Agent Raygoza's experience an objective and particularized basis to suspect that the driver was engaged in alien smuggling.

Defendant's arguments to the contrary are not persuasive. He first argues that, of the factors that courts have identified as relevant in the border stop context, only one— proximity to the border—supported a finding of reasonable suspicion. (Tr. 72–73.) The others, he says, either favored him or were not relevant. (Tr. 73.) He next argues that reasonable suspicion was lacking because Agent Stanley lost sight of the car twice before the stop, and because the agents did not use any of their technological capabilities (e.g., cameras, ground sensors) to confirm that noncitizens had recently crossed into the area.

---

[2] Two quick notes about Agent Raygoza: First, there was radio communication between Agent Raygoza and Agent Stanley, so all of the latter's observations are imputed to the former. *See United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007) (describing the collective knowledge doctrine). Second, Agent Raygoza did not attempt to stop (i.e., seize) Defendant until after the turn onto Thompson Peak Road. (Tr. 51.) Thus, his observations up to that point are part of the totality of the circumstances, even considering that the agents decided to stop the car while it was still on State Route 92. (Tr. 14.)

- 5 -

(Tr. 73–74.) Finally, he points out that there are innocent explanations for his conduct (e.g., Agent Raygoza agreed with defense counsel that the car "could have been a rental vehicle for one of the homeowners" on Thompson Peak Road (Tr. 64)).

Defendant's first argument is untenable, as the agents plainly had more than just Defendant's proximity to the border. They testified, for example, that the area south of Kings Ranch Road had had an increase in noncitizen foot traffic and was a known pickup area, that Thompson Peak Road is a known vehicle bailout point, and that these are remote areas with rough terrain (characteristics of the area; previous experience with alien smuggling in the area); that it was unusual to see a Phoenix-registered vehicle on Kings Ranch Road or a car on Thompson Peak Road (usual patterns of traffic); and that the car sped north on Kings Ranch Road after a short time in a known pickup area (driving behavior). *See Brignoni-Ponce*, 422 U.S. at 884–85 (identifying "characteristics of the area," "the usual patterns of traffic," "previous experience with alien traffic," and "[t]he driver's behavior" as relevant factors).

Defendant's second and third arguments also fail. The question is not whether the agents could have gathered more information; it is whether the information they gathered established reasonable suspicion. *See id.* at 884 ("Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area."). Thus, a defendant cannot defeat a finding of reasonable suspicion simply by pointing out that law enforcement could have been more thorough. And while it is true that there are innocent explanations for some of Defendant's conduct, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Furthermore, even a series of otherwise innocent acts can amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9. As such, Defendant's points do nothing to advance his position. *See Arvizu*, 534 U.S. at 274 (warning against a "divide-and-conquer analysis").

**Conclusion**

The stop was supported by reasonable suspicion of alien smuggling. Therefore, no Fourth Amendment violation occurred.

* * *

The Court **recommends** that Defendant's motion to suppress (Doc. 50) be **denied**.

This recommendation is not immediately appealable to the Ninth Circuit Court of Appeals. The parties have 14 days from the date of service of this recommendation to file specific written objections with the district court. Fed. R. Crim. P. 59(b)(2). The parties have 14 days to respond to objections. The parties may not file replies absent the district court's permission. The failure to file timely objections may result in the waiver of de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 17th day of July, 2023.

                                    Honorable Maria S. Aguilera
                                    United States Magistrate Judge